Good morning, Your Honor. Damon Baking, representing the plaintiff's family, and Robert Ruskey will be representing me on this issue. Your Honor, the key question in this case is, has Comcast shown that Nunn's evidence is insufficient to allow a jury to decide what he will say? I'm going to ask you to hold the microphone closer to your voice, and so you can keep your voice up. The key question here is whether Comcast has shown that Nunn's evidence is insufficient to allow a jury to decide whether he was fired because of his race or national origin. And Nunn here has shown that he has successfully produced such evidence on two related fronts. First, the discharge reasons are false because substantial questions as to the legitimate grounds exist for firing him. Mr. Bacon, it's my understanding you did not appeal age discrimination ruling, correct? Correct. So we don't have to worry about that one? Correct. All right, so then the next one we're leading to is race or national origin. Yes. Those are the ones we're now talking about? Yes, Your Honor. All right, again, if we're looking at a, if you will, prima facie case, I understand there's just slight evidentiary component, and I understand the district court assumed that your client had made that slight evidentiary case. But I want to ask you a couple of questions. How is it that you believe you made a case about performing confidently? Well, because Mr. Nunn was doing his job. The way he was doing his job? Well, the sole reason for terminating him rests entirely on an anonymous call. Well, just a minute, just a minute. We're not about determination now. We're talking about performing confidently in the position he held. So I look at the evidence about performing confidently, and automatically I start to look at this evidence that, as I understand it, on January 20, 2012, there was a request for vacation denied, but he took it anyway. On August 27, he didn't put on the generator in the lock bin, and it was stolen, and instead he secured it to the open truck, and he forgot to move it. And on October 22, 2012, he called to a power outage, and he installed the wrong 110-volt power supply. How can one say he's performing confidently in his position with those staring me doofeny in the face? Well, let me take them first to January 12, 2012 incident. He was allowed under company policy to take time off, and instead of allowing him even to have time off... I can argue about why or why not. I'm arguing, I'm asking you to really talk to me about why he was saying he was performing confidently with these three violations staring me right in the face. Well, for example, the issue of the generator. He reported it stolen when it came back from the, uh, inventory period. Well, he got a warning, right? Yes. Okay, and he got a warning. His second warning on the October 22nd, and he was suspended for three days on January the 20th. So in what evidence do I have that he was performing confidently? Well, on the bruising power outage in October, Your Honor, it was the severe rain. Did he get a warning? He was trying to work in severe... Did he get a warning? He did. Okay, so here we have him suspended and two warnings, and you're saying he was performing confidently. And I'm not going to what he was fired for, because that's not in the record at that point. But you have to say a prima facie case he was performing competently. And I look there on the record and I say, I don't know why there's a prima facie case he was performing competently. Well, if you look at the bruising power outage case, he was not the only time he was using that. It is a matter of arguing about it. All I can say is, one, there was a suspension for three days, one a warning, two a warning. So how can I say that he's performing competently? Well, how can you say he's not performing competently when the generator's been stolen? He had no, it was no fault of his. You can argue about whether or why or what, but on this record he got a warning. Well, at least he can argue he's still got a warning. So do I just ignore those three? Well, basically, Comcast is only basing its termination. I'm not talking about the termination now. We're talking about the performing competently. Well, I contend that he was performing competently. Well, I know you contend it. Is it enough to say, hey, I've had tenure, I've had promotions, I've had bonuses, I've had positive reviews to make your case? Or do these three glaring instances staring in front of me suggest you haven't made your case? I don't think so, Comcast. The issue of attending his son's graduation with the Air Force, the generator being stolen, is not affecting his performance. He still was performing his job in following company orders. As far as the outage, the other technician who was Caucasian, clearly outside his protected class, is the one who got the wrong power outage. Well, apparently you're not really understanding my question because I don't think arcing about these three is ever going to carry the case. You've either got to say, Judge, those three don't make any difference based on these other things I'm presenting to you on my private facing case or your list. I don't think they matter because they're not the basis for the termination, which is what the subject of the appeal is. And here you have a termination that's based solely on an anonymous call over the person's levels of whether it's an anonymous call to the Fourth Amendment case. Well, if you look at what Comcast argues as a basis to say it was true and reliable, and you look at the GPS records, for example, the GPS records, it actually proved that he was where he said he was and didn't lie. And when he was questioned, if you look at the excerpt of record 756, which is the declaration of Matt Silvey, the manager, he says, while there are slight adjustments to the longitude and latitude numbers listed on the report, this is due to movement of the satellite. Perhaps he questioned it because the GPS records support Nunn's story, that he went directly to Francisco Boulevard and did not lie about that. You look at the Watchtower program access. He says that he was not able to access it, but they refused to give the laptop to us or to Mr. Nunn, which, in this case, the jury could find in summary judgment that it must be presumed that unadmitted evidence would be the first in Comcast's name of the cell phone call and say that when the anonymous call came in that they tried to reach him and they couldn't. Nunn testified that there were no missed calls. He received one call, and he answered it again. He didn't produce the cell phone records, which would have supported his story. Well, the bottom line is, are you trying to say, that they do not establish the second prong of the McDonnell-Douglas test? Well, I mean, it seems to me that you have to establish a prima facie case, then we go to their part of the McDonnell-Douglas, if you will, the way this is tried. I don't think there's much to say that they haven't established their part of the case. I thought you'd be more worried about the pretext. Well, the pretext is what I want to get to. Well, let me ask you about the pretext. In your cause of action, you say that the protected class and national origin is broader than an immigrant rather than the more specific Filipino. Then it would seem to me, if I look at your comparisons, three of the five comparison employees identified are also immigrants, so they can't serve as comparisons, can they, for this national origin? Technician 3 and Technician 5 were both accused of falsification of records. You cannot use someone who is of the same, if you will, class as your particular client, and you suggest that that be a national origin class, that the broader immigrant class is the class rather than Filipino class. Then I look at your three of your five comparison employees. They're also immigrants. So it seems to me that they cannot show disparate impact either. So that leaves me, in my book, with two comparisons to show disparate conduct on the basis of national origin. Are those two enough? I think when you look at the race, the Caucasian and Hispanic involve all of them so clearly on the race, but the others were... Do you have a case that says that on the basis of two comparisons, that I am to suggest that's pretexting? Well, I think that there are, versus most immediate research cases, if you have others that were treated more favorably and were similarly situated, that that is enough to show that there is clearly disparate treatment between them. Let me ask you another question. All five of your employees, you allege, are similarly situated, and they're technicians, but two are not non-customer-facing technicians. They are, in fact, customer-facing technicians. Is that a distinction which we can make in determining whether they're similarly situated or not? Well, I understand they're all members of a union, but to face the customers directly, there are three who do not have your client. But they're all subject to the same rules. There's no difference. They're all subject to the same Article 10, Section B, 7, and the 7 is what they were accused of with the falsification of their time. I would like to reserve time for the other individual fundamentals. Martin, Your Honors, thank you very much for the keynote. The question on the sanctions imposed against Mr. Bainton is not whether he's entitled to due process before his sanction, but whether he got it as he was trying to bring us to the table. He didn't. He did not come remotely close to getting the award. Do you condemn that Mr. Bainton had to have notice in advance of the hearing that that subject would come up, as opposed to receiving notice at the hearing and an opportunity to argue then? He still got notice before hearing, and he didn't get notice at the hearing until the very end of the hearing. It's the first time the Court mentioned sanctions. Mr. Bainton had an 11-minute hearing. It came about a couple of minutes before the award was even mentioned. The motion, of course, is just a routine discovery. It's not a motion. It's a scrutiny. It's not an official discovery. And that's what Mr. Bainton was addressing, the motion and the oral argument. Do you wish to make a showing as to what Mr. Bainton would have done or would have said had he received notice in advance of the hearing, as opposed to receiving notice at the hearing? I don't think he did. I don't think he did. I just wanted to ask her a question because her question is very essential to me as well. You're saying he didn't have the notice, and if he had the notice he would have been able to do something and the judge was wrong, and therefore it's a due process violation. But what Judge Lynn is asking you is very important. Do you ever tell us what you said if you did have the notice? Well, we did have some of that in the record as best we can because we never had an opportunity to do the response. Well, he tells me now. What would you have said now? Well, he's here now on appeal. Tell me, what are you going to say? Because I'm a little worried, frankly, as it seems Judge Lynn's questions suggest, and I don't know what you just said anyway. We have responded to the allegations. What did you just say? We have said that Mr. Bainton did not delay discovery, that he was diligent in attempting to have the deposition of Mr. Gunn scheduled at a time of sanction. Because as it seems to me that the district court said, it's a bad fate to cooperate with counsel. However, if the discovery is completed before the discovery cutoff of June 15th, you need not pay the sanctions. Well, but the whole point was that it couldn't be completed before the June 15th. That's why there was a motion. And we never had an opportunity to respond. That's why it's not in the record. When we tested that an offer of detailed altercations be made, we never had a notice of the charges or notice that this was even an issue, even if there was plenty of opportunity for the court to notice it. Of course, since it was moving to a response case, it's the defendant's right asking for sanctions. It undercuts the whole fundamental fairness that's required of the process to say that he had to put out his case. Nonetheless, he can only direct notice of what he had to answer. This was the equivalent of a secure connection. All I'm trying to suggest is it would have looked very good if you had put in the record someplace, somebody had put in the record someplace, well, this is our offer of proof on this particular issue, Judge. This is what we say we would have done and what would have been our argument. Well, right now, we're left with, well, there was no opportunity to do that. Because all of our evidence turned out in the afterwards. We couldn't test it for reconsideration. There was no basis for reconsideration under the court's rules. It was not the question of Newton didn't really discover evidence or anything like that. Mr. DeBitten had the evidence. He never had the notice that he had to produce it under the court's rules. We're putting a cart before the horses. He didn't have to put out his case and he didn't even receive notice of the charges. And also finally, this is the final decision. Thank you very much. I'm taking it over. Thank you. Good morning, Your Honors. May it please the Court. My name is Erin Doyle, and I represent Comcast in this matter. To hear the district court correctly determines the plaintiff did not demonstrate a triable issue of fact as to whether Comcast honestly believed he had committed multiple serious offenses. And Comcast determined that he had been dishonest during its internal investigation into his misconduct. Plaintiff was also not shown that he was terminated on a 10.7 violation, right? In part, there were four. As I read everything that's in the record, the only thing I see that he was violated for was a 10.7 violation. The explanation in the record clearly states that Comcast believed he had been found sleeping on the job. Sleeping on the job is an undisputed serious offense under Just a minute. A 10.7 violation is the only violation in the record for which he was terminated. The explanation that you put under the violation, it depends on which document I look at. But when I look at for what reason this person was terminated, I only look at a 10.7 violation every time. All four of the reasons are stated in the record itself, including the 10.7 violation. And the case law is clear that as long as the employer's reasons are consistent, that they are not limited to necessarily what was stated on a termination form or in a termination meeting. All of the reasons for the employer's decisions are stated on the termination record. Well, here's my worry. And I guess this I need you to really help me with. It seems to me that wherever I read in the record this person was terminated for a 10.7 violation, I can read in different areas. And in fact, your brief emphasizes sleeping. Your brief emphasizes he wasn't honest in the investigation. But when I look at the reasons for the termination, it's 10.7 violation. So when I'm looking at pretext, I'm looking at the five employees who are all terminated for 10.7 violations. If I'm only using 10.7 violations, then it seems to me that he has a case for pretext. No, because the case law says that even where an employer states a reason for the person's termination and subsequently identifies another reason, that alone doesn't demonstrate pretext, because so long as those reasons are consistent. And that is certainly what the case here. Well, take for instance, if I look at 10.7 violation, and I look at these five employees, then I have 10.7 violation on each one, and they may come out differently. If I take 10.7 violation and I add to that sleeping, sleeping also makes the list of serious violations. But there are employees on this list who have had serious violations, not sleeping violations, but serious violations. And they were not terminated. So does that mean that that can be, if you will, an offset to your idea that this is not pretextual? Well, I don't think so because of the reason I just stated, but also because it's important to note that Non didn't commit just one 10.7 violation. He committed two. Well, there are two 10.7 violations by other employees on that list. They're just not sleeping. Well, the two 10.7 violations in Non's case were that he had inserted his on-site arrival time at the job site on Raina Del Mar at 11.15, but the GPS records show that he was physically located in Sher Park at that time. In addition, he submitted a time record showing that he had taken lunch between 12.14 and 1.14 p.m. And therefore, he had this whole almost hour and 15-minute period of unaccounted time. No other employee who was accused of a 10.7 violation submitted a time record, a false time record, and stole time from the company. Well, here's my worry. Do you know the case of Earl? Yes. At Earl, at 6.58, 5.03, and 11.15, it says, we do not require an exact match between violations in comparing the seriousness of the conduct. And so I tried to take Earl and put him to this particular case, and it seemed to me that we had a 10.7 violation in most of these particular five employees, and not only did we have the 10.7 violation, but we also had other serious violations which were committed by more than none, and they got different treatment. They weren't the same violation, if you will, but they were 10.7 plus another one which was on the list. And so I said to myself, why isn't Earl appropriately implied here? Let's send him back for a jury trial. Because Earl specifies that the employees need not be identical in all respects, but in all material respects. And solely because the label is slapped on the top of a disciplinary form, sort of a fill-in-the-box, involves the same general broad category of misconduct. It does not mean that the misconduct is necessarily comparable, as borne out by the explanations below the fill-in-the-blank box on the disciplinary record. I just find any case which says not only have you got to be fired for, if you will, dishonesty in filling out your time sheets or whatever, and sleeping, it doesn't seem to me that one can bear it down to that narrow of an approach that only comparable conduct the other side can give me was dishonest and sleeping. It would seem to me that if one would say dishonest, which is 10.7, and then have another serious violation, maybe not sleeping, but nonetheless serious violation, that that would nonetheless be comparable. Well, in Hahn v. Executive Job Management, the plaintiffs in that case, the male plaintiffs in that case, argued that another female employee had engaged in the same inappropriate sexually based contact at work, and that she wasn't fired. The court said, yeah, she may have engaged in the same inappropriate contact, but your contact led to a complaint, and her contact did not. And that was enough for that court to find those employees sufficiently dissimilar for purposes of a comparator analysis. The only problem that I have, I have in front of me Beck v. United Food. Beck v. United Food, which is a 2007 case, 506-103rd, and there we said we join other circuits in noting whether two employees are similarly situated is ordinarily a question of fact. In other words, let's not do it on summary judgment. Let's let the jury decide if they're similarly situated. So in this case where we have 10.7, and then we have some explanations, some of which also make the list, not necessarily sleeping, but they make the list, and I'm wondering whether to follow back, I'll let that go to the jury. Simply because it's normally a question of fact, in many cases, does not mean that it has to go to a jury where no reasonable juror can conclude that the misconduct is comparable. If they're both on the line, I guess I'd have to have a tough time understanding. I'd have to make the determination they're not comparable in order to suggest the jury couldn't make that determination. But on the face of the evident jury records themselves, first of all, it's important to note that the evident jury, the disciplinary records in this case, they lack foundation, non-testified on his deposition, that he didn't identify these individuals when asked whether or not he was aware of any other employees who engaged in similar misconduct. And on the face of those records, the employees simply did not engage in the same level of misconduct. None of those employees engaged in conduct that precipitated a concerned call from a member of the public regarding a Comcast employee. None of those employees submitted a time card that Comcast believed was false. None of those employees. I would say that those. I thought Mr. Lovell submitted a time card that was false. Non-testified that Mr. Lovell submitted a time card that was false. But if you look at Mr. Lovell's record and the explanation of his disciplinary action, it never says that. It says that he took an unexplained break of 25 minutes, not that he submitted a time card reflecting that. It's a key distinction. None was found to have stolen time. It was substantiated. But because he took an unexplained 67-minute break and then submitted a time card saying that he had taken an hour lunch at a different time, so he couldn't have been taking lunch during the unexplained break. In Mr. Lovell's case, he took, I think there's 25 minutes of unaccounted time. But there's no evidence that he actually charged the company for that time. The comparator is distinguishable from non because there's no indication that any of them lied, as Comcast concluded he did during the investigation. Absolutely. There is no indication on the face of the records that any of these employees were dishonest during the ensuing investigation. I believe in the case of Tech 5, it appears, based on the face of the record, that he misrepresented his location to a dispatch officer. And then when his supervisor went to the location, he couldn't find him. When his supervisor approached him about the issue, he immediately acknowledged that he had left his job location without authorization. But there were mitigating and distinguishing circumstances in that case involving a family emergency. And he said he had tried to contact his supervisor, but the supervisor's phone was busy. Again, there was no indication that he had been dishonest. He owned up to it during the first investigatory meeting. In contrast, Mr. Non first told Mr. Draftshot during their phone conversation on May 3rd that he was at the Raina Del Mar job site and that he had been there since 1045 that morning. And then at the first investigatory meeting that followed, he said he couldn't remember where he had been, but he indicated that he probably needed to leave the Raina Del Mar job site for Internet access. However, the GPS records confirmed that Mr. Non had gone straight from his first job in Brisbane to Sharp Park without ever stopping at the job site on Raina Del Mar. And that's the significance of the GPS records, which I believe plaintiff misunderstands. Has Non himself acknowledged that it was important that you establish that Non's prior disciplinary history did not impact the decision to terminate him? It's not necessarily important. It just didn't factor into the decision. The violations for which he was terminated were so egregious that they went straight to termination as allowed by the CBA. And there's also evidence in the record that prior disciplines issued under the CBA can only stay on the record for so long before they roll off and can no longer be considered in disciplinary decisions. That evidence is in the Supplemental Declaration of Matt Selfie. When we talk about his prima facie case, did you challenge the prima facie case in the District Court? We certainly did, Your Honor. Well, it seems to me that the District Court simply said, you've made that, we're not going to even worry about it because it's a questionable fact, and now you challenge it and say that those three prior violations show that he wasn't performing adequately. I believe the District Court assumed without deciding that Non had established the prima facie case.
judges: Bea, N.R. Smith, Lynn